Please be seated. Those of you who were not here earlier, Judge Welch has had a family emergency and Judge Goldenherz has now disqualified himself, so you only have me today. All right. Ready to proceed? Your Honor, good morning. My name is Clyde Keene. I represent Michael Sparks. Mr. Sparks currently serves a 35-year term of imprisonment in Menard Penitentiary. He has served 13 years and a 35-year sentence. I am here today to ask you to grant Mr. Sparks a new trial. Let me paint a picture for the court of a criminal justice system. It is a system in which a man who is 60 years old and lived a law-abiding life and never committed a crime in his life, who worked over 30 years for McDonnell Douglas on strategic aircraft and did a good job of it, who had property and personal interests and ties to the community, was held to no bail. And he was held to no bail and treated as if guilty for 782 days without a trial. This same system of justice, in the same system of justice, the state visited him on the 787th day. He was to go to trial, but instead of delivering him to trial, they had a private conversation with him at the county jail. And in that conversation, they explained to him, you're going to have a bodyguard next to you during this trial. And, take off your shirt, we're going to strap you into this device. It's an electronic shackling device. It's got nodules on the front of your chest and one on your back. And these two nodules are capable of inflicting 50,000 volts of electricity to your body. Your bodyguard is going to have a detonator. And if you don't follow his instructions during the course of this trial, he's going to hit you with 50,000 volts of electricity. If you make any sudden move during the course of this trial, he's authorized to use 50,000 volts of electricity. If you make any perceived hostile movement, you get 50,000 volts of electricity. If you should feel uncomfortable with this device during the course, don't tamper with it, because you're going to get 50,000 volts of electricity. Do I have to wear this? If you don't wear it, you don't go to court. Is there any dispute that no one told the judge that he was going to be shackled? Is there any dispute about that? No, I will get to that, Your Honor. I think that's an important point. So there you have it. That's the system that I described to you. Is this a system devised by some state like Germany in 1942? Or the Soviet Union in 1953? You're going to notice the system that was received, a justice system, that was imposed upon Michael Sparks on October 22, 2002 in the state of Illinois, United States of America. The state has said nothing in its brief that it was okay, that this was all right to have happened. What does the state say? Well, let me tell you what the state wants to hear today. The state won't come before this court and say, Your Honor, we've looked at this situation. We don't think the system that threatens a defendant when he goes to trial with physical harm throughout his trial for no good reason is a system worthy of confidence. We don't think it possesses the kind of dignity that we profess to give our judicial proceedings in this country. We understand that shackling an accused in this country is something that is done only in rare circumstances and only when two factors are involved, the safety of people in the courtroom or the risk of flight. And even then, judges have hearings to determine the degree of those factors. And even the individuals who would qualify to be shackled for those factors wouldn't qualify to be threatened with physical injury throughout the course of their trial. That is un-American. And because of that, Your Honor, we are going to confess this appeal. We're going to give Mr. Sparks a new trial. Because after all, we take an oath of office to defend and preserve the Constitution. And the Constitution and the dignity of the trial processes in this country are far more important than a single conviction of a single individual. And we will apologize to Mr. Sparks for the kind of process of verdict we gave him 13 years ago and holding him in prison on that process. And we'll give him a fair trial. You won't hear that. Is it a matter that the jury was unaware? No. The case law is clear. But now, that's what you won't hear from the state. What will you hear from the state? What is the core argument that the state makes with regard to this appeal? It's the defendant's fault. Yes. That's what the state says. If Mr. Sparks wanted a fair trial, a constitutional trial, he didn't want to be threatened with physical injury, 50,000 volts of electricity, throughout the course of his trial. He should have said so. Now, we know his lawyer was kept in the dark. We know the trial judge was kept in the dark. If Mr. Sparks knew he was strapped into this device, he should have said so. It's his fault. Well, I will say to this court that is a very telling argument, because there's no case in this land that would say that the defendant has to self-assess his constitutional rights and assert where they are weighted. But even if there was a scintilla of law in that regard, it still doesn't work in this case because of the testimony of Lieutenant Coleman at the hearing. And this gets into what the court inquired earlier. See, Lieutenant Coleman was asked, how many people were put to trial in Madison County, Illinois, strapped into this device and receiving these kinds of threats about the use of the device? How many people had to go through trial with a man with a detonator being more important than their lawyer? Sixteen people. Well, did any of them ever complain? Did any of them ever do what the state said Mr. Sparks had to do, or even weigh his right to a decent, fair trial? Oh, yeah, we had people say they're not wearing the belt. Really? Yeah. Then we go to the next stage. Well, what was the next stage? We would contact the trial judge. And what would the trial judge do? Oh, I can't say. That's speculation on my part. Well, you don't have any recollection of what happened when people would complain and say, I'm not wearing this contraption. I'm not going to be threatened with injury. All I can tell you is they all ended up going to trial with the contraption. So we don't know what the judges said, but we do know that people in lofty places who don garments that are black were complicit in this atrocious piece of policy in Madison County, Illinois. So what do we have as evidence of what people were told? Well, Herbert Lamb, an unimpeached stipulation, he said, they said, I have to wear the device. He said, I'm not wearing it. And they said to me, you'll wear it, but we're going to try you in your absence. And Michael Sparks said, when I said, do I have to wear this thing, they said, you can wear it or you don't go to court. Now, that is relatively undisputed fact in this case. We have cited to the court the case of People v. Harris as a third district court case, and it literally mirrors the facts of this case, and it would dictate a new trial for Mr. Sparks. But there is one significant difference in the Harris case that exists in this case, and it is a significant difference that separates this case from every Stumbelt case that you can find reported on in the law, Justice Waxman, and it is this. It is a document that exists in this record at C-498. It is the admonition form that is used in conjunction with strapping people into these electronic shackling devices. And it was manufactured, or developed, not by judges, not by the sheriff's office, but by the manufacturer of the electronic device. And it is the warning sheet that says, we're going to hit you with 50,000 volts of electricity if you don't follow an instruction. If your bodyguard even thinks that you're doing anything hostile, he can detonate the device. And another thing about the warning form is there's nothing on it to tell the individual what kind of harm 50,000 volts would do. Now, Mr. Sparks is a 60-year-old white man, so I assume he's got some clogging in his arteries. I can tell you this, he was acutely, acutely afraid of these warnings. So much so, that when a friend of his offered him a lifesaver minutes before he was to start his trial, he wouldn't take it. He looked over to his handler, his bodyguard, who had the detonator, and he said, is it okay, boss? Is it okay to have a lifesaver? He had already put himself in a position by virtue of these warnings that he was on the chain gang. That he couldn't do anything in court that wouldn't result potentially in him getting hit with 50,000 volts of electricity unless he satisfied his handler bodyguard. And by the way, his bodyguard went inside the rail of the court. He sat next to him throughout the course of the trial. He was close to him when his lawyer was during the course of the trial, the entire trial. And the state said he didn't wear a uniform, so the jury got no message from that, adverse message. Let me tell you the message, adverse message, the jury did get. Michael Sparks sat, according to the testimony in this case, undisputed testimony of Harvold Strolbeck, a 70-year-old supervisor at McDonald Douglas, of Michael Sparks. He said Michael wasn't himself when he walked into the courtroom. He wasn't the same guy I had visited before trial. He looked unhappy, unfriendly, and he sat in his chair, and he slumped down. I had him describe it. He sat with his shoulders slumped and his head between his shoulders, and that's the way he sat through trial. Michael Sparks described it. He said, I was far too quiet during trial. Why were you quiet? Because of this thing that he did. He assumed the posture of a guilty man, not someone interested in the evidence, not somebody who, when he heard a lie said about him, would make a perhaps sudden, hostile-looking movement. It permeated the presumption of innocence in this case. And then, there is the testimony of Michael Sparks about not testifying. And I suggested to the court to read the whole litany of that testimony, and particularly the cross-examination by the state, because it is very telling, and it brings very true. And he finally ends up, the final thing he says, I didn't want to get up there. I wanted to lay lie to the witnesses against me. But I didn't want to get up there and flip out. And let me explain to you why that's important, Justice McInnes. You see, Michael Sparks understood that he was capable of flipping out. It had happened to him before. It happened to him the day his wife died. He was found roaming around in circles in a soybean field with a .38 in his hand, completely out of it. Completely out of it. Out of touch with reality. And the state, the state knew, as Michael knew, that he could potentially flip out under the stress of testifying with a man with a detonator in his hand watching that testimony. The state knew that because their own password had found, before a trial started, that Michael Sparks suffered from profound Vietnam War post-traumatic stress syndrome. That he was a man capable, when put under stress, of completely disassociating from reality. The state knew that when they put that, strapped that machine on him. And by the way, when they did it, he'd had a lawyer for two years, Justice Waxman. He had Bill Luco over at the courthouse getting ready for the trial. The state carried on a private conversation with a representative individual on the day of his trial that involved threatening with physical injury during his trial. It doesn't get any worse than that. Maybe the state will get up there and say, it's okay. They didn't say a thing in their brief about it. Or maybe they'll say, you know what, the Sixth Amendment isn't. And this violation is really blatant. And threatening a person with physical harm throughout his trial is really bad. And you ought to give this man a new job. We ought to give this man a new job. Because we're part of this. We like to see a process that has dignity to it. I wish I had the opportunity to offer this opinion. Because it would be important to me. I avoided Vietnam. But Michael Sparks, well, he sat in a gunship for a year. And he took flak and fire. He saw people wounded. He saw people maimed. He saw them burned to death alive. He didn't come back with a wound or a scar on his body, but he did in his head. And the state put this kind of man, talked to him separately without the help of his lawyer, and they put him on trial in a machine in a contraption saying, don't do anything that we don't like. Absolutely preposterous. Let me tell you something else about 498 that sets this case apart. None of the other Stoneville cases knew about the kind of warnings that were coming with this felon. When you give warnings like this to an individual, you're affecting the structural fairness of the trial. This isn't something that is just harmless. It certainly wasn't harmless in terms of its actual effect in this case. It affected his decision on testifying. It affected the way he sat there during the course of the trial. It affected every movement of his truck. And it sent a message to this jury that he was guilty when in fact he didn't have a chance to participate in his defense. The Supreme Court scribed in Gideon v. Wainwright, Your Honor, the right to go on charge with a crime to counsel may not be deemed fundamental or essential to fair trials in some countries, but it is in ours. That's what I would write in this opinion. Not in this country. Not in America. We don't do these kinds of things. We respect the defendant's right to have his counsel present if the state is going to talk to him, and particularly if they're going to tell him how his trial is going to be conducted, and they're going to threaten him with physical harm if he doesn't comply with this ambler. Not in this country. In this country, we don't strap people into shackles, and we don't do it in a way that keeps it a secret from the trial judge and from his lawyer. Judge Michael Sparks testified, Lieutenant Coleman told him, you need to keep quiet about this and not complain about it. The state says, well, the judge didn't believe that. You know who was in the courtroom when that assertion was made? The guy that Michael Sparks said said it to him. Lieutenant Coleman was sitting right there, and Michael Sparks said, Lieutenant Coleman told me to keep quiet and not complain about this. And the state says, he should have. He's waived his right to a trial free from physical harm being threatened, and shackled. He's waived his right to a trial in which he can testify, or lean over to his lawyer and ask him to ask questions. He's waived all that because he kept quiet and didn't complain about it. If Michael Sparks was to be disbelieved in having been told that by the state, the state should have put on its witness and contradicted it. When they didn't, it lays truth to it. The trial court articulated it was a waiver by the chief of the court because he didn't raise it. Found the issue was waived. The trial court didn't raise it when? When it was brought to him at the third stage hearing. I don't understand the question. At the third stage hearing, the trial court finds that the issue that you're raising has been waived by procedural default. Correct? That's what happened. That is absolutely not what happened. It's what the state says happened. But on April 12, 2011, this same trial judge granted an evidentiary hearing. The state says we're going to waive this case. The standard of review is against the manifest weight of the evidence. And it is because there was an evidentiary hearing. She denied a motion to dismiss. There was no procedural default. When she's talking of waivers, she's talking about the plain error rule. This wasn't procedurally defaulted. We had an evidentiary hearing. And if it was procedurally defaulted, I wouldn't be conceding that the standard of review is manifest weight of the evidence. But let's talk about that now. What? Let's talk about that. You'll have an opportunity. Ms. Barman. Your Honor. Counsel. This is a post-conviction proceeding. Below, the court granted an evidentiary hearing as to the stun belt issue. The court dismissed the other two issues that the defendant now raises on appeal. The other issues that were raised in this post-conviction petition are not before this court, and the defendant has apparently abandoned them. The standard of review is whether the court's finding or denying the stun belt issue is manifestly erroneous. There was an evidentiary hearing, and at that evidentiary hearing after that, the court credited Lieutenant Coleman the stipulation regarding trial counsel, and the court also took notice of Judge Romani's ruling. The court did not credit the defendant's testimony and did not credit the Mallory's and did not credit Strovek's testimony. In his brief, the defendant asserts that plain error applies, but the Illinois Supreme Court in Owens has clearly set out that plain error does not apply in a post-conviction proceeding. The court below in its order did say that the issue was waived. It did not say procedural default, I added that. You did add that. But the court did find that it was waived, and the court's correct for several reasons. First of all, the defendant below at the second and third stage had the burden to show a substantial deprivation of a constitutional right, making him wear the stun belt. Now, he failed to do that utterly. Coleman. Why was the trial court never informed? Tell me how that occurred. Why did it occur? Has it always occurred? Does it still occur? I hope not. Coleman said that the court would not have been informed about the stun belt unless the defendant had refused to wear it, and none had ever done that, so I guess no judge has ever been informed. I'm not... The state isn't saying that this procedure was correct, but the state is not arguing that it was correct not to inform the trial counsel or the judge. That's not the issue. And, you know, Coleman testified that the defendant was a very pleasant, cooperative fellow. Up until this morning, the state was going to say there really wouldn't have been a reason to make him wear a stun belt other than the policy that was in place, but this morning the defendant's counsel says that the defendant admits that he could flip out and that he could become dissociative and lose touch with reality. Perhaps there would have been a reason to have him wear a stun belt,  None of that was ever alleged or proved? No, but he's admitted this morning by counsel. But the point is, the defendant agrees. The court did not know. The defendant, in his brief, admits that trial counsel did not know that he had a stun belt. So the issue is, how was, you know, counsel could not ask the court to do something about the stun belt issue because he was ignorant of it? The court, on its own, had no reason to take any action regarding the stun belt, like holding a loose hearing, because the court did not know. So we're down to the point where only the defendant and the officers knew that he had on a stun belt. Now, no juror testified that he, that they noticed that he had on a stun belt. Coleman testified that the stun belt was under the defendant's t-shirt, over which he had a shirt, over which he had a jacket and a tie, and that the stun belt had two packs on it that were the size of playing cards, one in the back, one in the front, and that it was fastened low down on his waist. The court did not credit Strobeck's testimony that the defendant was, that he noticed something, and no juror noticed it. What is a due process violation? One, that the jury noticed and inferred guilt, or two, that the defendant was inhibited in his ability to consult with counsel, or three, that the defendant did not testify merely because of the stun belt. None of those issues were proved, so there was no proof of a substantial deprivation of the constitutional right below, and that's why the court was correct in finding that, in denying the stun belt issue, although the court did use the term waived, and waived in the sense that no one who could have done anything about it was told. Counsel or the court. Now, and in Jonathan B., counsel wasn't aware, and the court wasn't aware, but the defendant was, and the Illinois Supreme Court found that there was no error in the court's failing to hold a booze hearing when the court had no reason to hold one, and that's kind of the situation that we're in now. So, it gets down to trial counsel, in his stipulation, said he would have, if he'd known about it, sought relief, a booze hearing or something. The court was unaware, and it's, you know, the court credited testimony that the defendant did not tell the court or trial counsel. Now... Do you agree that no booze hearing was required? If the court had been informed, the court would have had a duty to do it, but the court was not informed... So if you keep something from the court and it's something that shouldn't happen, how is that a waiver of a booze hearing? I mean, I don't understand that. Well, Jonathan B. holds that, that if you fail, if the court has no reason to know... But in actuality, was there a substantial deprivation of constitutional right? Judge Romani noted, and the court credited Judge Romani's notation, that the defendant moved around freely in court during the trial, and he consulted with his attorney often. And even the defendant, in his testimony, admitted that his counsel had told him to quit touching him under the table and try, you know, tell him how to conduct cross-examination. And he was told to be quiet and he would manage. So it doesn't seem like there was any... It doesn't seem the jury noticed it because it was small and it was under his shirt and his T-shirt and his coat. He was not inhibited in his ability to, in fact, have conversations with counsel or move around. So the court did not credit his testimony that he was too quiet. And obviously, Judge Romani had noted that he was not too quiet. He had conversations with his attorney often. The other thing is that when... There was a three- to four-month gap between his conviction and his sentencing. And at sentencing, he wanted a continuance. And the court allowed him, the defendant personally, with wide latitude, to address the court about all the issues that he wanted to address the court about. And the defendant, and it's quoted at length in the People's Brief, all of the complaints that the defendant had to make. And he mentions nothing about the stun belt. He mentions nothing about it. The court was correct in not crediting the defendant's self-serving testimony at the evidentiary hearing when everything else, all of his other actions during trial that were observed and all of his other statements during trial that were recorded, there's nothing about being inhibited personally by this stun belt. So the court was correct not to credit the defendant's self-serving testimony. So, in looking at all of this, in total, the evidence that was credited at the evidentiary hearing and at the record itself, the defendant, he simply does not set out a substantial deprivation of constitutional right. He was, I mean, he was required to wear this. The judge was not aware and trial counsel was not aware. But when he could have done something about it, he did nothing. He made no complaints, so apparently he was not truly bothered by it. The complaint comes up many years later. He was told not to or there would be a consequence. Well, three to four months later, he had three to four months between the trial and the sentencing hearing to talk to his counsel about it. Counsel did not raise anything about that in his motion for new trial. He wasn't stun belted when he had three to four months to talk to counsel about it and did not complain. And when at the sentencing hearing, at the motion, when he was arguing his reasons for wanting a continuance, he had wide latitude and said it's nothing about the stun belt and he's not stun belted. There's no evidence that he has wearing a stun belt at sentencing. So the defendant's actions during trial, the fact that he did in fact consult with his counsel and did move around freely and that he didn't make  when he could have when the stun belt was off is a reason the court should not have, properly did not credit his testimony at the evidentiary hearing. And so for all those reasons, well there's also, Lieutenant Coleman testified about having a conversation with the defendant about the effect of the stun belt being deployed and that it was somewhat like touching an electric fence, only not as bad as it would cause a large body cramp. It's not going to be fatal. 50,000 volts sounds terrible but this thing was powered by a transistor battery. It was not going to be fatal. There was no evidence the defendant had any physical problem that would have made the deploying of it physically harmful beyond the huge body cramp. And the defendant didn't deny having this conversation with Lieutenant Coleman. So that's another reason why his testimony about abject fear of being stunned simply is not credible. Is it relevant at all? What? His fear? It would be if it was credible but the court did not. What does it matter if it's a violation to do what was done The difference is between a proceeding on direct appeal and a post-conviction proceeding. The difference is at this point the burden is on the defendant to show a substantial deprivation of a constitutional right and he failed to meet that burden and he failed to do it with credible evidence and the court was correct to deny this after an evidentiary hearing. The record that was made contemporaneous to the trial is that he was talking to counsel. He did consult with counsel and they had no trouble moving around the courtroom. That was from the judge's observations and the defendant's own statement is that his attorney had to tell him to quit touching him under the table and he did so. So, there's just the credible evidence does not show that he had a paralyzing fear of being stabbed and that's why the court properly denied this portion of the defendant's post-conviction petition. Counsel did not discuss the other two issues unless this court has any questions and I will ask the court to affirm. Thank you, counsel. Dean. Justice Wexler, there's far too much I would like to say in five minutes. Let me try. First off, let's look at the trial court's ruling in this case. The state argued to the trial court that the plain air doctrine should be applied to the evidence that was heard. That's what she did because they said so. I was arguing that we had maintained a showing of a substantial violation of a constitutional right and that's all we needed to do to get a new trial. And good God, didn't we demonstrate the violation of a substantial constitutional right? What other defendant has shown that he went to trial under constant threat of physical harm? 50,000 volts of electricity isn't stunning enough? I'll tell you, the protocol with regard to it is immediate medical attention if it is used. No matter whether you have heart disease or not. And Mr. Sparks took it as serious business. He took it as very serious business. Well, so, the trial court applied the plain air doctrine. And the plain air doctrine says the first thing you do is you look to see if there was any error. And she looked at it and she says, you know what? Justice Romani was kept in the dark. He didn't know about this. And the trial judge didn't know about it. I mean, the trial judge and the defense lawyer didn't know about it. So there couldn't have been a post-hearing. There's no error in this case. Therefore, I don't have to indulge myself with going to the second prong and seeing whether the error was substantial or not. The state says that the trial judge discounted the testimony of Sparks that he was afraid that he would flip out if he testified in this device. They say that he discounted Strobeck's testimony about the demeanor where his head was hung. Mallory's testimony about not taking a lifesaver. But she discounted all that. She didn't even look at it. She said there was no error. And she dispensed with it. And said because there's no error, it's weighed in the drill. She didn't discount this testimony. And if she had, it would have been preposterous. A seven-year-old man with a mock citizen comes in and says, my friend sat there like he was a guilty man throughout the trial. It was unlike him. I don't know why he acted that way. It was because there was a guy with a detonator sitting next to him. No, the judge found no error whatsoever. The fact that the sheriff was able to accomplish ignorance on the part of the court with regard to the dastardly unconstitutional shackling that was engaged. The fact that he was able to keep it from the trial counsel by telling Sparks to keep quiet and by having a blatantly violated Sixth Amendment visit with the defendant.  counsel would have known about this if they would have  Constitution. And the right to counsel protects, safeguards all the other rights. That's why it's so important. And that's why the violation is so blatantly bad in this case. Because this man never would have been put through the unfair trial he was if they would have notified Bill Luko to be there. Bill Luko wouldn't have tolerated these threats. And let me tell you this, Judge, this is a case of first impression in this regard. Common Law Record 498. Lieutenant Coleman testified, I didn't take it to court. I didn't file that document. It bears no file stamp. Nobody knows how it got on into the record. It wasn't supposed to be there. And it was never there in any of the other Sunbelt cases. So this case is a case where not only we have the illegal strapping an individual into shackles, who by the way was a perfect gentleman, a perfect prisoner, not a flight risk, not a safety risk. We not only have strapping him into this device, we know something everybody else didn't know. When he was strapped into the device, they said you're going to get 50,000 volts if you don't follow an instruction. If you make  move, if you make any perceived cost, if you tamper with the device, basically in every term, if we don't like what you're doing, we're going to zap you with 50,000 volts of electricity. He went to trial under constant threat of physical injury. And the state misses the point entirely when it says, there's no juror to testify that they saw this device. Can we call jurors on the process? Look how absurd these arguments are. Could the jurors have said, we can't call jurors to say, yeah, I noticed the nodules on his front and his back. But they say, see, there's no error here because they didn't prove that. They say we didn't prove that he didn't testify because of this device. Poppycock! Can I quote one quote from my brief, Your Honor? I rarely do this, but it's with regard to the dignity of this proceeding, the dignity that occurred back in October. And I spoke to it in my brief, and here's what I wrote. A judicial process that would allow what happened here, upon learning about its having occurred, condoned and is absent of any error whatsoever, is hardly a worthy of any confidence in its ability to preserve and protect fairness in trials processed to verdict. I believe it from the bottom of my heart that this man should have a fair trial. Please break it. Thank you both. The court will take the matter under advisement and will be in a short recess. All rise.